## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAWRENCE HOLLIN, Derivatively on Behalf of Nominal Defendant LINCOLN NATIONAL CORPORATION, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) ) | **JURY TRIAL DEMANDED** |
| ELLEN G. COOPER, DENNIS R. GLASS, RANDAL J. FREITAG, DEIRDRE P. CONNELLY, WILLIAM H. CUNNINGHAM, REGINALD E. DAVIS, ERIC G. JOHNSON, GARY C. KELLY, M. LEANNE LACHMAN, DALE LEFEBVRE, JANET LIANG, MICHAEL F. MEE, LYNN M. UTTER, and PATRICK S. PITTARD, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) ) | |
| and | ) ) | |
| LINCOLN NATIONAL CORPORATION, | ) ) ) | |
| Nominal Defendant. | ) | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Lawrence Hollin ("Plaintiff"), by and through his undersigned attorneys, brings this verified stockholder derivative action on behalf of nominal defendant Lincoln National Corporation ("Lincoln" or the "Company"), against certain of the Company's executive officers and its Board of Directors (the "Board") for breaches of fiduciary duties and violations of federal law by the Individual Defendants (defined below). Plaintiff's allegations are based on personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by his counsel, including review of publicly available information regarding the Company; the allegations of a class action

complaint filed in the Securities Class Action captioned *Meade v. Lincoln Nat'l Corp. et al.,* Case No. 2:24-cv-01704-JFM (E.D. Pa. Apr. 23, 2024); (the "Securities Class Action"); conference call transcripts and announcements; filings with the United States Securities and Exchange Commission (the "SEC"); press releases disseminated by Lincoln; legal filings; news reports; and securities analysts' reports about the Company.

## NATURE OF THE ACTION

1.      This shareholder derivative action is brought on behalf of Lincoln against certain officers and members of the Company's Board for breaches of their fiduciary duties between at least November 4, 2020 and November 2, 2022, inclusive (the "Relevant Period"), and for violations of the federal securities laws caused by the issuance of materially false and misleading statements issued, or caused to be issued, by the Individual Defendants in the Company's SEC filings and other public statements. The Individual Defendants' wrongdoing has exposed the Company to massive potential liability to the class, as well as the significant defense costs in the Securities Class Action, as set forth below.

2.      Lincoln, commonly known as Lincoln Financial Group, is a holding company, incorporated in Indiana and based in Radnor, Pennsylvania, which offers a wide range of financial products through its subsidiaries.

3.      The Company reports financial results through four segments which constitute its primary areas of operation: Annuities, Life Insurance, Group Protection, and Retirement Plan Services. Lincoln's Life Insurance segment provides various life insurance products, including universal life insurance, variable universal life ("VUL") insurance, and indexed universal life insurance, some of which include secondary guarantees.

4.      The primary factors that determine profitability in the Life Insurance segment are

mortality margins, investment margins, expenses, and surrender fees.

5.     Throughout the Relevant Period, the Company's executive officers and members of its Board issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Lincoln's variable universal life insurance business was declining; (ii) as a result, the Company's goodwill related to its Life Insurance segment was materially overstated; (iii) Lincoln was therefore relying on outdated policy lapse assumptions; (iv) Lincoln's reserves were therefore overstated; and (v) as a result of the foregoing, the Individual Defendants' positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

6.     The truth was revealed on November 2, 2022, when the Company announced its financial results for the third fiscal quarter of 2022, disclosing a net loss of $2.6 billion, compared to a net income of $318 million during the same period of the prior year. The Company stated that "[t]he current quarter's adjusted operating results included net unfavorable notable items of $2.0 billion, or $11.62 per share, related to the company's annual review of DAC and reserve assumptions." The Company further revealed that it "incurred a $634 million goodwill impairment to the life insurance business."

7.     On this news, the price of Lincoln's stock declined 33.2% in one day, closing at a price of $34.83 per share on November 3, 2022.

8.     As a result of the foregoing, the Securities Class Action was filed against Lincoln and certain of its executive officers, exposing the Company to massive class-wide liability.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section

27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9) promulgated thereunder by the SEC.

10.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

13.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391(b)(1), as Lincoln maintains its principal executive offices in this District and a substantial portion of the acts and omissions alleged herein, including the issuance and dissemination of materially false and misleading information, occurred in this District.

## PARTIES

*Plaintiff*

14.     Plaintiff is, and has been at all relevant times, a shareholder of Lincoln.

*Nominal Defendant*

15.     Nominal Defendant Lincoln is incorporated under the laws of the State of Indiana.

16.     The Company's principal executive offices are located at 150 North Radnor-Chester Road, Suite A305, Radnor, Pennsylvania 19087. Lincoln's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "LNC."

*Individual Defendants*

17.     Defendant Ellen G. Cooper ("Cooper") has served as Lincoln's President and Chief Executive Officer ("CEO") and as the Chairman of its Board since May, 2022. Prior to that, Defendant Cooper served as Lincoln's Chief Investment Officer from 2012 until 2021 and as Executive Vice President from 2012 until 2022. According to the Company's public filings, Defendant Cooper received $9,098,310 in 2022 in compensation from the Company. As of March 15, 2024, Defendant Cooper beneficially owns 442,647 shares of Lincoln stock,[1] worth $11,991,307.[2] Defendant Cooper was named as a Defendant in the Securities Class Action.

18.     Defendant Deirdre P. Connelly ("Connelly") has served as a member of the Board since 2016 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Connelly received $305,000 in 2022 in compensation from the Company. As of March 15, 2024, Defendant Connelly beneficially owns 35,513 shares of Lincoln stock, worth $962,047.

19.     Defendant William H. Cunningham ("Cunningham") has served as a member of the Board since 2006. According to the Company's public filings, Defendant Cunningham received $415,462 in 2022 in compensation from the Company. As of March 15, 2024, Defendant Cunningham beneficially owns 185,998 shares of Lincoln stock, worth $5,038,685.

20.     Defendant Reginald E. Davis ("Davis") has served as a member of the Board since 2020 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Davis received $285,000 in 2022 in compensation from the Company. As of March 15, 2024, Defendant Davis beneficially owns 15,678 shares of Lincoln stock, worth $424,717.

---

[1] Individual Defendants' holdings of Lincoln stock includes both common stock and restricted stock units.
[2] Valuations of the Individual Defendants' personal holdings of Company stock are calculated based on the $27.09 per share closing price of Lincoln common stock on March 15, 2024.

21.     Defendant Eric G. Johnson ("Johnson") has served as a member of the Board since 1998. According to the Company's public filings, Defendant Johnson received $295,000 in 2022 in compensation from the Company. As of March 15, 2024, Defendant Johnson beneficially owns 94,732 shares of Lincoln stock, worth $2,566,289.

22.     Defendant Gary C. Kelly ("Kelly") has served as a member of the Board since 2009 and serves as Chair of the Audit Committee. According to the Company's public filings, Defendant Kelly received $295,000 in 2022 in compensation from the Company. As of March 15, 2024, Defendant Kelly beneficially owns 59,824 shares of Lincoln stock, worth $1,620,632.

23.     Defendant M. Leanne Lachman ("Lachman") has served as a member of the Board since 1985 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Lachman received $354,400 in 2022 in compensation from the Company. As of March 15, 2024, Defendant Lachman beneficially owns 67,076 shares of Lincoln stock, worth $1,817,088.

24.     Defendant Dale LeFebvre ("LeFebvre") has served as a member of the Board since 2021 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant LeFebvre received $300,000 in 2022 in compensation from the Company. As of March 15, 2024, Defendant LeFebvre beneficially owns 14,953 shares of Lincoln stock, worth $405,076.

25.     Defendant Janet Liang ("Liang") has served as a member of the Board since 2021. According to the Company's public filings, Defendant Liang received $279,594 in 2022 in compensation from the Company. As of March 15, 2024, Defendant Liang beneficially owns 19,014 shares of Lincoln stock, worth $515,089.

26.     Defendant Michael F. Mee ("Mee") has served as a member of the Board since 2001. According to the Company's public filings, Defendant Mee received $275,000 in 2022 in

compensation from the Company. As of March 15, 2024, Defendant Mee beneficially owns 119,311 shares of Lincoln stock, worth $3,232,134.

27.     Defendant Lynn M. Utter ("Utter") has served as a member of the Baord since 2017. According to the Company's public filings, Defendant Utter received $290,000 in 2022 in compensation from the Company. As of March 15, 2024, Defendant Utter beneficially owns 44,013 shares of Lincoln stock, worth $1,192,312.

***Non Director Defendants***

28.     Defendant Dennis R. Glass ("Glass") served as a member of the Board from 2006 until May 2023 and served as Lincoln's CEO from July 2007 until May 2022. According to the Company's public filings, Defendant Glass received $16,760,924 in 2021 and $6,454,525 in 2022 in compensation from the Company. Defendant Glass was named as a Defendant in the Securities Class Action.

29.     Defendant Patrick S. Pittard ("Pittard") served as a member of the Board from 2006 until May 2023. According to the Company's public filings, Defendant Pittard received $344,400 in 2022 in compensation from the Company.

30.     Defendant Randal J. Freitag ("Freitag") served as Lincoln's Chief Financial Officer ("CFO") from 2011 until February 2023. According to the Company's public filings, Defendant Freitag received $9,355,517 in 2022 in compensation from the Company. Defendant Freitag was named as a Defendant in the Securities Class Action.

## <u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>

31.     Because of their positions as officers and/or directors of Lincoln, and their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Lincoln and its shareholders fiduciary obligations of good faith, loyalty, trust, and candor and were

required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner at all relevant times.

32.     Therefore, the Individual Defendants were required to act in furtherance of the best interests of Lincoln and its shareholders.

33.     Each director and officer of the Company owes to Lincoln and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Lincoln, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of trust, loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Lincoln, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

36.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance,

growth, financial statements, earnings, internal controls, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's predatory sales practices, and the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

37.     To discharge their duties, the officers and directors of Lincoln were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Lincoln were required to, among other things:

(a)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Indiana and the United States, and pursuant to Lincoln's own Code of Conduct;

(b)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion;

(d)     Remain informed as to how Lincoln conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(e)     Establish and maintain systematic and accurate records and reports of the

business and internal affairs of Lincoln and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Lincoln's operations would comply with all applicable laws and Lincoln's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(g)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     When put on notice of problems with the Company's business practices, operations, or internal controls, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

38.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Lincoln.

39.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Lincoln and were at all times acting within the course and scope of such agency.

40.     Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

41.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

42.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

43.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

44.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Lincoln, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

45.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual

or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

46.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Lincoln and at all times acted within the course and scope of such agency.

## LINCOLN'S CODE OF CONDUCT

47.     Lincoln's Code of Conduct begins with a commitment to upholding a "legacy of ethics, honest and doing the right thing."

48.     The Code of Conduct includes a message from Defendant Cooper which states, in pertinent part:

> Our focus on doing what's right is the foundation of our culture and our success here at Lincoln. It's at the heart of everything we do and, as one of Ethisphere's *World's Most Ethical Companies*, our integrity sets us apart. It's up to all of us to carry on this tradition of excellence, and we should always look to the Code of Conduct for help when needed.

49.     The Code of Conduct applies to "everyone, at every level of Lincoln Financial and to every person and entity working on [the Company's] behalf," and violations of the Code of Conduct may lead to disciplinary action, including "anything from written or verbal warnings to probationary periods, termination, civil liability or even criminal charges."

50.     In a section titled "Media relations," the Code of Conduct highlights the importance of "ensur[ing] that information communicated about [the] company is consistent and accurate."

51.     In a section titled "Competition and antitrust," the Code of Conduct states: "We believe in a competitive marketplace. As a Lincoln Financial employee, you have a responsibility to comply with laws that promote full and fair competition." In the same section, the Code of

Conduct emphasizes to "[b]e truthful in describing the qualities, features and availability of our products and services to customers."

52.     In a section titled "Physical, electronic and financial assets," the Code of Conduct states: "As a Lincoln Financial employee, you share a responsibility to safeguard the physical, electronic and financial assets that are provided to you throughout the course of your employment."

53.     In a section titled "Financial controls," the Code of Conduct states:

Financial controls help keep our day-to-day practices in line with our big picture values. By complying with applicable laws, regulations and company policies, you play a major role in protecting the integrity of our company. Record transactions honestly, accurately and completely at all times and always report any activity that you think may be fraudulent.

## LINCOLN'S AUDIT COMMITTEE CHARTER

54.     Lincoln's Audit Committee Charter states that the purpose of the Audit Committee is to assist the Board in its oversight of:

(i)     the integrity of the Corporation's financial statements;
(ii)    the Corporation's compliance with legal and regulatory requirements;
(iii)   the independent auditor's qualifications and independence;

* * *

(v)     the Corporation's policies and processes for risk assessment and risk management.

55.     In a section titled "Duties and Powers of the Audit Committee," the Audit Committee Charter states:

[W]ith respect to the Corporation's consolidated financial statements, financial reporting process, and systems of internal accounting and financial controls,

(i)     to receive from management and the independent auditor and review a timely analysis of significant financial reporting issues and practices;
(ii)    to discuss with the independent auditor the matters required to be discussed in accordance with Auditing Standard No. 1301, and recommend to the Board whether the audited financial statements should be included in the Corporation's Form 10-K;

(iii)    to receive from the independent auditor and review the report to the audit committee required to be provided pursuant to Section 10A(k) of the Securities Exchange Act of 1934, as amended;

(iv)    to meet with management, the independent auditor, and the General Auditor:

- to review the respective annual audit plans of the independent auditor and General Auditor;
- to discuss the annual consolidated financial statements and the quarterly consolidated financial statements and the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Corporation's SEC filings and annual report to shareholders, if applicable;
- to discuss the independent auditor's report on management's assessment of internal controls over financial reporting as required by Section 404 of the Sarbanes-Oxley Act of 2002 and related rules of the SEC;

* * *

- to discuss any significant proposed or contemplated changes to the Corporation's accounting principles, policies, controls, procedures, practices, and auditing plans; and
- to discuss, as appropriate: (a) any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Corporation's selection or application of accounting principles, and major issues as to the adequacy of the Corporation's internal controls and any special audit steps adopted in light of material control deficiencies; (b) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; (c) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Corporation; and (d) earnings press releases, including the type and presentation of information therein (paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information), as well as financial information and earnings guidance provided to analysts and rating agencies (which discussion may be in general terms).

56.    The Audit Committee Charter further tasks the Audit Committee with the following responsibility:

[T]o discuss guidelines and policies governing the process by which management of the Corporation and the relevant departments of the Corporation assess and manage the Corporation's exposure to risk, and to discuss the Corporation's major financial risk exposures and the steps management has taken to monitor and control such exposures.

57.     With respect to enterprise risk management, the Audit Committee Charter states that the Audit Committee shall "inquire about the Corporation's significant categories of risks and exposures" and "discuss the steps taken to monitor and manage such risks."

## SUBSTANTIVE ALLEGATIONS

*Background*

58.     Lincoln, commonly known as Lincoln Financial Group, is a holding company, incorporated in Indiana and based in Radnor, Pennsylvania, which offers a wide range of financial products through its subsidiaries.

59.     The Company reports financial results through four segments which constitute its primary areas of operation: Annuities, Life Insurance, Group Protection, and Retirement Plan Services. Lincoln's Life Insurance segment provides various life insurance products, including universal life insurance, variable universal life insurance, and indexed universal life insurance, some of which include secondary guarantees.

60.     The primary factors that determine profitability in the Life Insurance segment are mortality margins, investment margins, expenses, and surrender fees.

*Materially False and Misleading Statements*

61.     On November 4, 2020, Lincoln issued a press release announcing the Company's financial results for the third fiscal quarter of 2020 (the "3Q20 Release"). Regarding the Company's review of reserve assumptions, the 3Q20 Release stated:

> The current quarter's adjusted operating results included net unfavorable notable items of $552 million, or $2.84 per share, primarily related to the company's annual review of DAC and reserve assumptions. The prior-year quarter included net unfavorable notable items of $403 million, or $2.00 per share, related to the company's annual review of DAC and reserve assumptions.

* * *

Life insurance expense ratio improved 40 basis points.

* * *

Total Life Insurance in-force of $878 billion grew 10% over the prior-year quarter, and average account values of $55 billion increased 5% over the same period. The current quarter included net unfavorable notable items of $440 million related to the company's annual review of DAC and reserve assumptions while prior year results included net unfavorable notable items of $320 million related to the company's annual review of DAC and reserve assumptions.

62.     The 3Q20 Release reported the following quarterly financial results:

| (in millions, except per share data) | As of or For the Quarter Ended September 30, | | As of or For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| Net Income (Loss) | $      398 | $      (161) | $      356 | $      454 |
| Net Income (Loss) Available to Common Stockholders | 393 | (164) | 340 | 454 |
| Net Income (Loss) per Diluted Share Available to Common Stockholders[1] | 2.01 | (0.83) | 1.74 | 2.24 |
| Revenues | 5,361 | 4,638 | 13,303 | 12,913 |
| Adjusted Income (Loss) from Operations | (133) | (46) | 519 | 873 |
| Adjusted Income (Loss) from Operations per Diluted Share Available to Common Stockholders | (0.72) | (0.25) | 2.57 | 4.30 |
| Average Diluted Shares | 195.4 | 201.6 | 195.9 | 203.1 |
| Return on Equity (ROE), Including Accumulated Other Comprehensive Income (AOCI) (Net Income) | 7.5% | -3.4% | 2.5% | 3.5% |
| Adjusted Operating ROE, Excluding AOCI (Income from Operations) | -3.9% | -1.3% | 5.1% | 8.3% |
| Book Value per Share, Including AOCI | $   111.51 | $   100.84 | $   111.51 | $   100.84 |
| Book Value per Share, Excluding AOCI | 71.10 | 69.33 | 71.10 | 69.33 |

[1] Due to reporting a net loss for the three months ended September 30, 2019 and an adjusted loss from operations for the three months ended September 30, 2019 and September 30, 2020, basic shares were used in the diluted EPS and adjusted diluted EPS calculations for those periods as the use of diluted shares would have resulted in a lower loss per share.

63.   With respect to the Company's goodwill, the 3Q20 Release reported the following:

| Average Stockholders' Equity | | |
|---|---|---|
| Average equity, including average AOCI | $ | 21,140 |
| Average AOCI | | 7,566 |
| Average equity, excluding AOCI | | 13,574 |
| Average goodwill | | 1,778 |
| Average equity, excluding AOCI and goodwill | $ | 11,796 |
| | | |
| **Return on Equity, Including AOCI** | | |
| Net income (loss) with average equity including goodwill | | 7.5% |
| | | |
| **Adjusted Operating Return on Equity, Excluding AOCI** | | |
| Adjusted income (loss) from operations with average equity | | |
| including goodwill | | -3.9% |
| Adjusted income (loss) from operations with average equity | | |
| excluding goodwill | | -4.5% |

64.   On November 5, 2020, the Company filed a quarterly report on Form 10-Q with the SEC for its third fiscal quarter of 2020 (the "3Q20 10-Q"), which reported the following results for the Company's life insurance segment, in millions:

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| **Operating Revenues** | | | | |
| Insurance premiums [1] | $   223 | $   219 | $   676 | $   656 |
| Fee income | 1,141 | 1,275 | 2,865 | 2,985 |
| Net investment income | 761 | 601 | 2,035 | 1,952 |
| Operating realized gain (loss) [2] | - | (1) | (5) | (5) |
| Amortization of deferred gain on | | | | |
| business sold through reinsurance | 3 | - | 9 | - |
| Other revenues | (1) | 4 | 7 | 12 |
| Total operating revenues | 2,127 | 2,098 | 5,587 | 5,600 |
| **Operating Expenses** | | | | |
| Interest credited | 369 | 360 | 1,116 | 1,069 |
| Benefits | 1,428 | 1,426 | 3,465 | 3,240 |
| Commissions and other expenses | 730 | 630 | 1,250 | 1,206 |
| Total operating expenses | 2,527 | 2,416 | 5,831 | 5,515 |
| Income (loss) from operations before taxes | (400) | (318) | (244) | 85 |
| Federal income tax expense (benefit) | (89) | (73) | (67) | 6 |
| Income (loss) from operations | $   (311) | $   (245) | $   (177) | $   79 |

[1]   Includes term insurance premiums, which have a corresponding partial offset in benefits for changes in reserves.
[2]   See "Realized Gain (Loss) and Benefit Ratio Unlocking" below.

65.   With respect to Lincoln's policies regarding benefit reserves, the 3Q20 10-Q stated:

*We calculate the value of the benefit reserves and the embedded derivative reserves based on the specific characteristics of each guaranteed living benefit ("GLB") feature.*

*We use a hedging strategy designed to mitigate the risk and income statement volatility* caused by changes in the equity markets, interest rates *and volatility associated with GLBs offered in our variable annuity products, including products with guaranteed withdrawal benefit and guaranteed income benefit features.* Changes in the value of the hedge contracts due to changes in equity markets, interest rates and implied volatilities hedge the income statement effect of changes in embedded derivative GLB reserves caused by those same factors. *We rebalance our hedge positions based upon changes in these factors as needed.*

66.     The 3Q20 10-Q stated that Lincoln utilizes an "ongoing valuation process" during which it "assess[es] the reasonableness of [the Company's] valuation techniques or models and *make adjustments as necessary*" using a "*mortality rate [] based on a combination of company and industry experience, adjusted for improvement factors*" to determine the "components of the transfers into and out of" certain "changes in unrealized gains (losses) included in net income, excluding any effect of amortization of DAC, VOBA, DSI and DFEL and *changes in future contract benefits, related to financial instruments carried at fair value*." The 3Q20 10-Q included the following summary of the "fair value (in millions), valuation techniques and significant unobservable inputs of the Level 3 fair value measurements as of September 30, 2020":

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Liabilities** | | | | | | | |
| Future contract benefits – indexed annuity and IUL contracts embedded derivatives | $ | (2,688) | Discounted cash flow | Lapse rate [3] | 0% | 9% | (10) |
| | | | | Mortality rate [7] | | (9) | (10) |
| Other liabilities – GLB direct embedded derivatives | | (1,106) | Discounted cash flow | Long-term lapse rate [3] | 1% | 30% | (10) |
| | | | | Utilization of guaranteed withdrawals [4] | 85% | 100% | 94% |
| | | | | Claims utilization factor [5] | 60% | 100% | (10) |
| | | | | Premiums utilization factor [5] | 80% | 115% | (10) |
| | | | | NPR [6] | 0.13% | 1.62% | 1.13% |
| | | | | Mortality rate [7] | | (9) | (10) |
| | | | | Volatility [8] | 1% | 28% | 14.28% |

[1]   Unobservable inputs were weighted by the relative fair value of the instruments, unless otherwise noted.

[2]   The liquidity/duration adjustment input represents an estimated market participant composite of adjustments attributable to liquidity premiums, expected durations, structures and credit quality that would be applied to the market observable information of an investment.

[3]   The lapse rate input represents the estimated probability of a contract surrendering during a year, and thereby foregoing any future benefits. The range for indexed annuity and IUL contracts represents the lapse rates during the surrender charge period.

[4]   The utilization of guaranteed withdrawals input represents the estimated percentage of contract holders that utilize the guaranteed withdrawal feature.

[5]   The utilization factors are applied to the present value of claims or premiums, as appropriate, in the GLB reserve calculation to estimate the impact of inefficient withdrawal behavior, including taking less than or more than the maximum guaranteed withdrawal.

[6]   The NPR input represents the estimated additional credit spread that market participants would apply to the market observable discount rate when pricing a contract. The NPR input was weighted by the absolute value of the sensitivity of the reserve to the NPR assumption.

[7]   The mortality rate input represents the estimated probability of when an individual belonging to a particular group, categorized according to age or some other factor such as gender, will die.

[8]   The volatility input represents overall volatilities assumed for the underlying variable annuity funds, which include a mixture of equity and fixed-income assets. Fair value of the variable annuity GLB embedded derivatives would increase if higher volatilities were used for valuation. Volatility assumptions vary by fund due to the benchmarking of different indices. The volatility input was weighted by the relative account value assigned to each index.

[9]   The mortality rate is based on a combination of company and industry experience, adjusted for improvement factors.

[10]  A weighted average input range is not a meaningful measurement for lapse rate, utilization factors or mortality rate.

67.    On February 3, 2021, Lincoln issued a press release announcing its financial results for the fiscal quarter and full year ended December 31, 2020 (the "2020 Release"). The 2020 Release reported the following financial results:

| (in millions, except per share data) | As of or For the Three Months Ended December 31, | | As of or For the Year Ended December 31, | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | 2020 | 2019 |
| Net Income (Loss) | $ 143 | $ 431 | $ 499 | $ 886 |
| Net Income (Loss) Available to Common Stockholders | 143 | 430 | 499 | 886 |
| Net Income (Loss) per Diluted Share Available to Common Stockholders | 0.74 | 2.15 | 2.56 | 4.38 |
| Revenues | 4,135 | 4,344 | 17,439 | 17,258 |
| Adjusted Income (Loss) from Operations | 346 | 482 | 865 | 1,355 |
| Adjusted Income (Loss) from Operations per Diluted Share Available to Common Stockholders | 1.78 | 2.41 | 4.45 | 6.71 |
| Average Diluted Shares | 193.9 | 200.0 | 195.8 | 202.1 |
| Return on Equity (ROE), Including Accumulated Other Comprehensive Income (AOCI) (Net Income) | 2.6% | 8.7% | 2.5% | 4.9% |
| Adjusted Operating ROE, Excluding AOCI (Income from Operations) | 10.1% | 13.9% | 6.3% | 9.7% |
| Book Value per Share, Including AOCI | $ 118.02 | $ 100.11 | $ 118.02 | $ 100.11 |
| Book Value per Share, Excluding AOCI | 71.59 | 71.27 | 71.59 | 71.27 |

\* \* \*

***Life insurance expense ratio improved 140 basis points compared to the prior-year quarter and 60 basis points for the full year***

\* \* \*

Life Insurance reported income from operations of $144 million compared to $179 million in the prior-year quarter as ***favorable returns within the company's alternative investment portfolio and expense management were more than offset by unfavorable mortality related to the pandemic.***

\* \* \*

| **Average Stockholders' Equity** | |
| --- | --- |
| Average equity, including average AOCI | $ 22,124 |
| Average AOCI | 8,370 |
| Average equity, excluding AOCI | 13,754 |
| Average goodwill | 1,778 |
| Average equity, excluding AOCI and goodwill | $ 11,976 |
| | |
| **Return on Equity, Including AOCI** | |
| Net income (loss) with average equity including goodwill | 2.6% |
| | |
| **Adjusted Operating Return on Equity, Excluding AOCI** | |
| Adjusted income (loss) from operations with average equity including goodwill | 10.1% |
| Adjusted income (loss) from operations with average equity excluding goodwill | 11.6% |

68.     On February 18, 2021, Lincoln filed its annual report for fiscal year 2020 on Form 10-K with the SEC (the "2020 10-K"), which was signed by defendants Glass, Freitag, Connelly, Cunningham, Davis, Henderson, Johnson, Kelly, Lachman, Mee, Pittard, Utter. With respect to

Lincoln's valuation of goodwill and other intangible assets, the 2020 10-K stated:

> ***Goodwill and intangible assets with indefinite lives are not amortized, but are reviewed for impairment annually as of October 1 and more frequently if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value.*** Intangibles that do not have indefinite lives are amortized over their estimated useful lives. ***We perform a quantitative goodwill impairment test where the fair value of the reporting unit is determined and compared to the carrying value of the reporting unit. If the carrying value of the reporting unit exceeds the reporting unit's fair value, goodwill is impaired and written down to the reporting unit's fair value.*** The results of one test on one reporting unit cannot subsidize the results of another reporting unit. For the purposes of the evaluation of the carrying value of goodwill, our reporting units (Annuities, Retirement Plan Services, Life Insurance and Group Protection) correspond with our reporting segments.
>
> * * *
>
> As of October 1, 2020 and 2019, ***we performed our annual quantitative goodwill impairment test for our reporting units, and, as of each such date, the fair value was in excess of each reporting unit's carrying value for Annuities, Retirement Plan Services, Life Insurance and Group Protection.***

69.     The 2020 10-K reported the following figures regarding the Company's goodwill and specifically identifiable intangible assets:

| | For the Year Ended December 31, 2020 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Gross Goodwill as of Beginning-of-Year | Accumulated Impairment as of Beginning-of-Year | Acquisition Accounting Adjustments | Impairment | Net Goodwill as of End-of-Year |
| Annuities | $ 1,040 | $ (600) | $ - | $ - | $ 440 |
| Retirement Plan Services | 20 | - | - | - | 20 |
| Life Insurance | 2,188 | (1,554) | - | - | 634 |
| Group Protection | 684 | - | - | - | 684 |
| Total goodwill | $ 3,932 | $ (2,154) | $ - | $ - | $ 1,778 |

70.     The 2020 10-K stated that Lincoln's Life Insurance segment held $7,383 million in DAC (deferred acquisition costs) and VOBA (value of business acquired) gross, and $5,660 million in unrealized gain on the same, for a carrying value of $1,723 million.

71.     With respect to Lincoln's policies regarding the accounting of deferred acquisition

costs, the 2020 10-K stated:

> *[W]e conduct our annual comprehensive review of the assumptions and projection models underlying the amortization of DAC, VOBA, DSI, DFEL, embedded derivatives and reserves for life insurance and annuity products in the third quarter of each year.* We may have unlocking in other quarters as we become aware of information that warrants updating assumptions outside of our annual comprehensive review.

72.     With respect to Lincoln's policies regarding reserves, the 2020 10-K stated:

> *The assumptions on which reserves are based are intended to represent an estimation of experience for the period that policy benefits are payable. If actual experience is better than or equal to the assumptions, then reserves should be adequate to provide for future benefits and expenses. If experience is worse than the assumptions, additional reserves may be required. This would result in a charge to our net income during the period the increase in reserves occurred.* The key experience assumptions include mortality rates, policy persistency and interest rates. We periodically review our experience and update our policy reserves for new issues and reserve for all claims incurred, as we believe appropriate.

73.     On April 16, 2021, the Company filed a Proxy Statement on Form DEF 14A (the "2021 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Connelly, Cunningham, Davis, Glass, Henderson, Johnson, Kelly, Lachman, Mee, Pittard, and Utter to serve for another one-year term on the Company's Board and the compensation of certain of the Company's executive officers including Defendants Glass, Freitag, and Cooper. The 2021 Proxy reported $1,778 million in net goodwill for the fiscal year ended December 31, 2020.

74.     With respect to the Company's internal controls, the 2023 Proxy stated that "Management has primary responsibility for . . . establishing financial reporting systems and internal controls" and "reporting on the effectiveness of [the Company's] internal controls over financial reporting."

75.     On May 5, 2021, Lincoln issued a press release announcing the Company's financial results for the first fiscal quarter of 2021, which reported the following:

|  | As of or For the Three Months Ended March 31, | |
|---|---|---|
| (in millions, except per share data) | 2021 | 2020 |
| Net Income (Loss) | $ 225 | $ 52 |
| Net Income (Loss) Available to Common Stockholders | 225 | 29 |
| Net Income (Loss) per Diluted Share Available to Common Stockholders | 1.16 | 0.15 |
| Revenues | 4,534 | 4,425 |
| Adjusted Income (Loss) from Operations | 350 | 465 |
| Adjusted Income (Loss) from Operations per Diluted Share Available to Common Stockholders | 1.82 | 2.24 |
| Average Diluted Shares | 193.1 | 197.3 |
| Return on Equity (ROE), Including Accumulated Other Comprehensive Income (AOCI) (Net Income) | 4.3% | 1.1% |
| Adjusted Operating ROE, Excluding AOCI (Adjusted Income from Operations) | 10.2% | 13.5% |
| Book Value per Share, Including AOCI | $ 102.50 | $ 85.79 |
| Book Value per Share, Excluding AOCI | 72.36 | 70.24 |

\* \* \*

***Life Insurance average-in force face amount of $901 billion, up 8%***

\* \* \*

Life Insurance reported income from operations of $107 million compared to $171 million in the prior-year quarter as ***pandemic-related mortality was partially offset by favorable returns within the company's alternative investment portfolio and expense management.***

Total Life Insurance sales were $114 million compared to $169 million in the prior year quarter, however sales were in line with the prior quarter.

Average Life Insurance in-force of $901 billion grew 8% over the prior-year quarter, and average account values of $58 billion increased 10% over the same period.

23

* * *

| | | |
|---|---|---:|
| **Average Stockholders' Equity** | | |
| Average equity, including average AOCI | $ | 21,146 |
| Average AOCI | | 7,346 |
| Average equity, excluding AOCI | | 13,800 |
| Average goodwill | | 1,778 |
| Average equity, excluding AOCI and goodwill | $ | 12,022 |
| | | |
| **Return on Equity, Including AOCI** | | |
| Net income (loss) with average equity including goodwill | | 4.3% |
| | | |
| **Adjusted Operating Return on Equity, Excluding AOCI** | | |
| Adjusted income (loss) from operations with average equity including goodwill | | 10.2% |
| Adjusted income (loss) from operations with average equity excluding goodwill | | 11.6% |

76.     On May 6, 2021, Lincoln filed a quarterly report on Form 10-Q with the SEC for its first fiscal quarter of 2021 (the "1Q21 10-Q"), which reported the following results from the Company's Life Insurance segment, in millions:

| | For the Three Months Ended March 31, | |
|---|---:|---:|
| | **2021** | **2020** |
| **Operating Revenues** | | |
| Insurance premiums [1] | $     253 | $     224 |
| Fee income | 867 | 893 |
| Net investment income | 809 | 697 |
| Operating realized gain (loss) [2] | (2) | (3) |
| Amortization of deferred gain on business sold through reinsurance | 3 | 3 |
| Other revenues | 9 | 7 |
| Total operating revenues | 1,939 | 1,821 |
| **Operating Expenses** | | |
| Interest credited | 370 | 371 |
| Benefits | 1,173 | 954 |
| Commissions and other expenses | 266 | 287 |
| Total operating expenses | 1,809 | 1,612 |
| Income (loss) from operations before taxes | 130 | 209 |
| Federal income tax expense (benefit) | 23 | 38 |
| Income (loss) from operations | $     107 | $     171 |

[1]  Includes term insurance premiums, which have a corresponding partial offset in benefits for changes in reserves.
[2]  See "Realized Gain (Loss)" below.

77.     The 1Q21 10-Q repeated substantially similar statements with respect to the Company's policies regarding reserves and hedging that were contained in the 3Q20 10-Q.

78.     The 1Q21 10-Q repeated substantially similar statements regarding the Company's

use of a "mortality rate [] based on a combination of company and industry experience, adjusted for improvement factors" that were contained in the 3Q20 10-Q, and reported the following:

**Liabilities**

| | | | | | | |
|---|---|---|---|---|---|---|
| Future contract benefits – indexed annuity contract embedded derivatives | $ (4,107) | Discounted cash flow | Lapse rate [3] | 0% - | 9% | (10) |
| | | | Mortality rate [7] | | (9) | (10) |
| Other liabilities – GLB ceded embedded derivatives | (152) | Discounted cash flow | Long-term lapse rate [3] | 1% - | 30% | (10) |
| | | | Utilization of guaranteed withdrawals [4] | 85% - | 100% | 94% |
| | | | Claims utilization factor [5] | 60% - | 100% | (10) |
| | | | Premiums utilization factor [5] | 80% - | 115% | (10) |
| | | | NPR [6] | 0.07% - | 1.43% | 0.95% |
| | | | Mortality rate [7] | | (9) | (10) |
| | | | Volatility [8] | 1% - | 28% | 14.71% |

[1] Unobservable inputs were weighted by the relative fair value of the instruments, unless otherwise noted.

[2] The liquidity/duration adjustment input represents an estimated market participant composite of adjustments attributable to liquidity premiums, expected durations, structures and credit quality that would be applied to the market observable information of an investment.

[3] The lapse rate input represents the estimated probability of a contract surrendering during a year, and thereby foregoing any future benefits. The range for indexed annuity contracts represents the lapse rates during the surrender charge period.

[4] The utilization of guaranteed withdrawals input represents the estimated percentage of contract holders that utilize the guaranteed withdrawal feature.

[5] The utilization factors are applied to the present value of claims or premiums, as appropriate, in the GLB reserve calculation to estimate the impact of inefficient withdrawal behavior, including taking less than or more than the maximum guaranteed withdrawal.

[6] The NPR input represents the estimated additional credit spread that market participants would apply to the market observable discount rate when pricing a contract. The NPR input was weighted by the absolute value of the sensitivity of the reserve to the NPR assumption.

[7] The mortality rate input represents the estimated probability of when an individual belonging to a particular group, categorized according to age or some other factor such as gender, will die.

[8] The volatility input represents overall volatilities assumed for the underlying variable annuity funds, which include a mixture of equity and fixed-income assets. Fair value of the variable annuity GLB embedded derivatives would increase if higher volatilities were used for valuation. Volatility assumptions vary by fund due to the benchmarking of different indices. The volatility input was weighted by the relative account value assigned to each index.

[9] The mortality rate is based on a combination of company and industry experience, adjusted for improvement factors.

[10] A weighted average input range is not a meaningful measurement for lapse rate, utilization factors or mortality rate.

79.    On April 4, 2021, Lincoln issued a press release announcing the Company's financial results for the second fiscal quarter of 2020, which reported the following:

| (in millions, except per share data) | As of or For the Three Months Ended June 30, | | As of or For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Net Income (Loss) | $ 642 | $ (94) | $ 867 | $ (42) |
| Net Income (Loss) Available to Common Stockholders | 642 | (94) | 867 | (52) |
| Net Income (Loss) per Diluted Share Available to Common Stockholders[1] | 3.34 | (0.49) | 4.51 | (0.27) |
| Revenues | 4,851 | 3,517 | 9,386 | 7,942 |
| Adjusted Income (Loss) from Operations | 608 | 187 | 959 | 652 |
| Adjusted Income (Loss) from Operations per Diluted Share Available to Common Stockholders | 3.17 | 0.97 | 4.98 | 3.27 |
| Average Diluted Shares | 192.2 | 193.8 | 192.4 | 196.2 |
| Return on Equity (ROE), Including Accumulated Other Comprehensive Income (AOCI) (Net Income) | 12.4% | -2.0% | 8.3% | -0.5% |
| Adjusted Operating ROE, Excluding AOCI (Adjusted Income from Operations) | 17.3% | 5.5% | 13.8% | 9.6% |
| Book Value per Share (BVPS), Including AOCI | $ 115.00 | $ 107.28 | $ 115.00 | $ 107.28 |
| Book Value per Share, Excluding AOCI | 75.45 | 69.38 | 75.45 | 69.38 |

[1] Due to reporting a net loss for the three months ended June 30, 2020 and six months ended June 30, 2020, basic shares were used in the diluted EPS and adjusted diluted EPS calculations for those periods as the use of diluted shares would have resulted in a lower loss per share.

\* \* \*

***Life Insurance average account values of $59 billion, up 12%***

\* \* \*

Life Insurance reported income from operations of $255 million compared to a loss from operations of $(37) million in the prior-year quarter driven ***by favorable returns within the company's alternative investment portfolio and improved mortality results as pandemic impacts have declined.***

Total Life Insurance sales were $126 million compared to $159 million in the prior year quarter, however sales increased 11% sequentially.

Average Life Insurance in-force of $917 billion grew 7% over the prior-year quarter, and average account values of $59 billion increased 12% over the same period.

\* \* \*

| **Average Stockholders' Equity** | | |
|---|---|---|
| Average equity, including average AOCI | $ | 20,669 |
| Average AOCI | | 6,620 |
| Average equity, excluding AOCI | | 14,049 |
| Average goodwill | | 1,778 |
| Average equity, excluding AOCI and goodwill | $ | 12,271 |
| | | |
| **Return on Equity, Including AOCI** | | |
| Net income (loss) with average equity including goodwill | | 12.4% |
| | | |
| **Adjusted Operating Return on Equity, Excluding AOCI** | | |
| Adjusted income (loss) from operations with average equity including goodwill | | 17.3% |
| Adjusted income (loss) from operations with average equity excluding goodwill | | 19.8% |

80.    On August 5, 2021, Lincoln filed a quarterly report on Form 10-Q with the SEC for the second fiscal quarter of 2020 (the "2Q21 10-Q"), which reported the following results from the Company's Life Insurance segment:

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| **Operating Revenues** | | | | |
| Insurance premiums [1] | $    258 | $    230 | $    511 | $    454 |
| Fee income | 915 | 830 | 1,783 | 1,723 |
| Net investment income | 852 | 577 | 1,661 | 1,274 |
| Operating realized gain (loss) [2] | (2) | (2) | (4) | (5) |
| Amortization of deferred gain on business sold through reinsurance | 3 | 3 | 5 | 6 |
| Other revenues | 3 | 1 | 12 | 8 |
| Total operating revenues | 2,029 | 1,639 | 3,968 | 3,460 |
| **Operating Expenses** | | | | |
| Interest credited | 372 | 375 | 742 | 746 |
| Benefits | 999 | 1,084 | 2,172 | 2,037 |
| Commissions and other expenses | 341 | 232 | 607 | 520 |
| Total operating expenses | 1,712 | 1,691 | 3,521 | 3,303 |
| Income (loss) from operations before taxes | 317 | (52) | 447 | 157 |
| Federal income tax expense (benefit) | 62 | (15) | 85 | 23 |
| Income (loss) from operations | $    255 | $    (37) | $    362 | $    134 |

[1]   Includes term insurance premiums, which have a corresponding partial offset in benefits for changes in reserves.
[2]   See "Realized Gain (Loss)" below.

81.    The 2Q21 10-Q repeated substantially similar statements with respect to the Company's policies regarding reserves and hedging that were contained in the 3Q20 10-Q.

82.    The 2Q21 10-Q repeated substantially similar statements regarding the Company's use of a "mortality rate [] based on a combination of company and industry experience, adjusted for improvement factors" that were contained in the 3Q20 10-Q, and reported the following:

| Liabilities | | | | | | | |
|---|---|---|---|---|---|---|---|
| Other liabilities – GLB ceded embedded | | | | | | | |
| derivatives | (152) | Discounted cash flow | Long-term lapse rate [3] | 1% | - | 30% | (10) |
| | | | Utilization of guaranteed withdrawals [4] | 85% | - | 100% | 94% |
| | | | Claims utilization factor [5] | 60% | - | 100% | (10) |
| | | | Premiums utilization factor [5] | 80% | - | 115% | (10) |
| | | | NPR [6] | 0.06% | - | 1.37% | 0.90% |
| | | | Mortality rate [7] | | | (9) | (10) |
| | | | Volatility [8] | 1% | - | 28% | 14.52% |

[1]    Unobservable inputs were weighted by the relative fair value of the instruments, unless otherwise noted.
[2]    The liquidity/duration adjustment input represents an estimated market participant composite of adjustments attributable to liquidity premiums, expected durations, structures and credit quality that would be applied to the market observable information of an investment.
[3]    The lapse rate input represents the estimated probability of a contract surrendering during a year, and thereby forgoing any future benefits.
[4]    The utilization of guaranteed withdrawals input represents the estimated percentage of contract holders that utilize the guaranteed withdrawal feature.
[5]    The utilization factors are applied to the present value of claims or premiums, as appropriate, in the GLB reserve calculation to estimate the impact of inefficient withdrawal behavior, including taking less than or more than the maximum guaranteed withdrawal.
[6]    The NPR input represents the estimated additional credit spread that market participants would apply to the market observable discount rate when pricing a contract.  The NPR input was weighted by the absolute value of the sensitivity of the reserve to the NPR assumption.
[7]    The mortality rate input represents the estimated probability of when an individual belonging to a particular group, categorized according to age or some other factor such as gender, will die.
[8]    The volatility input represents overall volatilities assumed for the underlying variable annuity funds, which include a mixture of equity and fixed-income assets.  Fair value of the variable annuity GLB embedded derivatives would increase if higher volatilities were used for valuation.  Volatility assumptions vary by fund due to the benchmarking of different indices.  The volatility input was weighted by the relative account value assigned to each index.
[9]    The mortality rate is based on a combination of company and industry experience, adjusted for improvement factors.
[10]   A weighted average input range is not a meaningful measurement for lapse rate, utilization factors or mortality rate.

83.    On November 3, 2021, Lincoln issued a press release announcing the Company's financial results for the third fiscal quarter of 2021, which reported the following:

| (in millions, except per share data) | As of or For the Three Months Ended September 30, | | As of or For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Net Income (Loss) | $ 318 | $ 398 | $ 1,185 | $ 356 |
| Net Income (Loss) Available to Common Stockholders | 318 | 393 | 1,185 | 340 |
| Net Income (Loss) per Diluted Share Available to Common Stockholders | 1.68 | 2.01 | 6.19 | 1.74 |
| Revenues | 5,241 | 5,361 | 14,627 | 13,303 |
| Adjusted Income (Loss) from Operations | 307 | (133) | 1,265 | 519 |
| Adjusted Income (Loss) from Operations per Diluted Share Available to | | | | |
| Common Stockholders [1] | 1.62 | (0.72) | 6.62 | 2.57 |
| Average Diluted Shares | 189.1 | 195.4 | 191.3 | 195.9 |
| Return on Equity (ROE), Including Accumulated Other Comprehensive | | | | |
| Income (AOCI) (Net Income) | 5.9% | 7.5% | 7.5% | 2.5% |
| Adjusted Operating ROE, Excluding AOCI (Adjusted Income from Operations) | 8.6% | -3.9% | 12.0% | 5.1% |
| Book Value per Share (BVPS), Including AOCI | $ 113.77 | $ 111.51 | $ 113.77 | $ 111.51 |
| Book Value per Share, Excluding AOCI | 76.96 | 71.10 | 76.96 | 71.10 |

[1] Due to reporting an adjusted loss from operations for the three months ended September 30, 2020, basic shares were used in the adjusted diluted EPS calculation for that period as the use of diluted shares would have resulted in a lower loss per share.

\* \* \*

*Life Insurance average account values of $60 billion, up 9%*

\* \* \*

*Life Insurance reported income from operations of $93 million compared to a loss from operations of $(311) million in the prior-year quarter. Impacts from the company's annual review of DAC and reserve assumptions were unfavorable in both periods, and the current quarter also included a legal expense. Not including the impacts from the company's annual reviews of DAC and reserve assumptions and the legal expense, income from operations increased from the prior-year period driven by favorable returns within the company's alternative investment portfolio, which were partially offset by unfavorable mortality results.*

While total Life Insurance sales were $166 million compared to $186 million in the prior-year quarter, sales increased 32% sequentially.

Average Life Insurance in-force of $935 billion grew 7% over the prior-year quarter, and average account values of $60 billion increased 9% over the same period.

*The current quarter included net unfavorable notable items of $45 million related to the company's annual review of DAC and reserve assumptions and legal expenses while prior-year results included net unfavorable notable items of $440 million related to the company's annual review of DAC and reserve assumptions.*

\* \* \*

| **Average Stockholders' Equity** | | |
|---|---|---|
| Average equity, including average AOCI | $ | 21,458 |
| Average AOCI | | 7,164 |
| Average equity, excluding AOCI | | 14,294 |
| Average goodwill | | 1,778 |
| Average equity, excluding AOCI and goodwill | $ | 12,516 |
| | | |
| **Return on Equity, Including AOCI** | | |
| Net income (loss) with average equity including goodwill | | 5.9% |
| | | |
| **Adjusted Operating Return on Equity, Excluding AOCI** | | |
| Adjusted income (loss) from operations with average equity including goodwill | | 8.6% |
| Adjusted income (loss) from operations with average equity excluding goodwill | | 9.8% |

84.     On November 4, 2021, Lincoln filed a quarterly report on Form 10-Q with the SEC for its third fiscal quarter of 2021, which reported the following results from the Company's Life Insurance segment, in millions:

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| **Operating Revenues** | | | | |
| Insurance premiums [1] | $ 256 | $ 223 | $ 767 | $ 676 |
| Fee income | 1,230 | 1,141 | 3,014 | 2,865 |
| Net investment income | 832 | 761 | 2,493 | 2,035 |
| Operating realized gain (loss) [2] | - | - | (4) | (5) |
| Amortization of deferred gain on business sold through reinsurance | 3 | 3 | 8 | 9 |
| Other revenues | 4 | (1) | 15 | 7 |
| Total operating revenues | 2,325 | 2,127 | 6,293 | 5,587 |
| **Operating Expenses** | | | | |
| Interest credited | 375 | 369 | 1,117 | 1,116 |
| Benefits | 976 | 1,428 | 3,148 | 3,465 |
| Commissions and other expenses | 861 | 730 | 1,468 | 1,250 |
| Total operating expenses | 2,212 | 2,527 | 5,733 | 5,831 |
| Income (loss) from operations before taxes | 113 | (400) | 560 | (244) |
| Federal income tax expense (benefit) | 20 | (89) | 105 | (67) |
| Income (loss) from operations | $ 93 | $ (311) | $ 455 | $ (177) |

[1]   Includes term insurance premiums, which have a corresponding partial offset in benefits for changes in reserves.

[2]   See "Realized Gain (Loss)" below.

85.     The 3Q21 10-Q repeated substantially similar statements with respect to the Company's policies regarding reserves and hedging that were contained in the 3Q20 10-Q.

86.     The 3Q21 10-Q repeated substantially similar statements regarding the Company's

use of a "mortality rate []" based on a combination of company and industry experience, adjusted for improvement factors" that were contained in the 3Q20 10-Q, and reported the following:

| Liabilities | | | | | | | |
|---|---|---|---|---|---|---|---|
| Future contract benefits – indexed annuity contracts embedded derivatives | $ | (4,758) | Discounted cash flow | Lapse rate [3] | 0% | - 9% | (10) |
| | | | | Mortality rate [7] | | (9) | (10) |
| Other liabilities – GLB ceded embedded derivatives | | (146) | Discounted cash flow | Long-term lapse rate [3] | 1% | - 30% | (10) |
| | | | | Utilization of guaranteed withdrawals [4] | 85% | - 100% | 94% |
| | | | | Claims utilization factor [5] | 60% | - 100% | (10) |
| | | | | Premiums utilization factor [5] | 80% | - 115% | (10) |
| | | | | NPR [6] | 0.08% | - 1.37% | 0.93% |
| | | | | Mortality rate [7] | | (9) | (10) |
| | | | | Volatility [8] | 1% | - 28% | 14.55% |

[1]  Unobservable inputs were weighted by the relative fair value of the instruments, unless otherwise noted.

[2]  The liquidity/duration adjustment input represents an estimated market participant composite of adjustments attributable to liquidity premiums, expected durations, structures and credit quality that would be applied to the market observable information of an investment.

[3]  The lapse rate input represents the estimated probability of a contract surrendering during a year, and thereby forgoing any future benefits. The range for indexed annuity contracts represents the lapse rates during the surrender charge period.

[4]  The utilization of guaranteed withdrawals input represents the estimated percentage of contract holders that utilize the guaranteed withdrawal feature.

[5]  The utilization factors are applied to the present value of claims or premiums, as appropriate, in the GLB reserve calculation to estimate the impact of inefficient withdrawal behavior, including taking less than or more than the maximum guaranteed withdrawal.

[6]  The NPR input represents the estimated additional credit spread that market participants would apply to the market observable discount rate when pricing a contract. The NPR input was weighted by the absolute value of the sensitivity of the reserve to the NPR assumption.

[7]  The mortality rate input represents the estimated probability of when an individual belonging to a particular group, categorized according to age or some other factor such as gender, will die.

[8]  The volatility input represents overall volatilities assumed for the underlying variable annuity funds, which include a mixture of equity and fixed-income assets. Fair value of the variable annuity GLB embedded derivatives would increase if higher volatilities were used for valuation. Volatility assumptions vary by fund due to the benchmarking of different indices. The volatility input was weighted by the relative account value assigned to each index.

[9]  The mortality rate is based on a combination of company and industry experience, adjusted for improvement factors.

[10]  A weighted average input range is not a meaningful measurement for lapse rate, utilization factors or mortality rate.

87.     On February 2, 2022, Lincoln issued a press release announcing the Company's financial results for its fourth fiscal quarter and full year 2021, which reported the following:

| (in millions, except per share data) | As of or For the Three Months Ended December 31, | | As of or For the Year Ended December 31, | |
| --- | --- | --- | --- | --- |
| | 2021 | 2020 | 2021 | 2020 |
| Net Income (Loss) | $ 220 | $ 143 | $ 1,405 | $ 499 |
| Net Income (Loss) Available to Common Stockholders | 220 | 143 | 1,405 | 499 |
| Net Income (Loss) per Diluted Share Available to Common Stockholders | 1.20 | 0.74 | 7.43 | 2.56 |
| Revenues | 4,604 | 4,135 | 19,230 | 17,439 |
| Adjusted Income (Loss) from Operations | 286 | 346 | 1,551 | 865 |
| Adjusted Income (Loss) from Operations per Diluted Share Available to Common Stockholders | 1.56 | 1.78 | 8.20 | 4.45 |
| Average Diluted Shares | 183.2 | 193.9 | 189.1 | 195.8 |
| Return on Equity (ROE), Including Accumulated Other Comprehensive Income (AOCI) (Net Income) | 4.2% | 2.6% | 6.7% | 2.5% |
| Adjusted Operating ROE, Excluding AOCI (Adjusted Income from Operations) | 8.1% | 10.1% | 11.0% | 6.3% |
| Book Value per Share (BVPS), Including AOCI | $ 114.41 | $ 118.02 | $ 114.41 | $ 118.02 |
| Book Value per Share, Excluding AOCI | 78.05 | 71.59 | 78.05 | 71.59 |

\* \* \*

Life Insurance reported income from operations of $80 million compared to $144 million in the prior-year quarter, primarily driven by **strong returns within the company's alternative investment portfolio that were not as favorable as last year and the previously communicated $10 million impact from the block reinsurance transaction executed in the third quarter of 2021.**

\* \* \*

**Average Stockholders' Equity**

| | |
| --- | --- |
| Average equity, including average AOCI | $ 20,721 |
| Average AOCI | 6,645 |
| Average equity, excluding AOCI | 14,076 |
| Average goodwill | 1,778 |
| Average equity, excluding AOCI and goodwill | $ 12,298 |

**Return on Equity, Including AOCI**

| | |
| --- | --- |
| Net income (loss) with average equity including goodwill | 4.2% |

**Adjusted Operating Return on Equity, Excluding AOCI**

| | |
| --- | --- |
| Adjusted income (loss) from operations with average equity including goodwill | 8.1% |
| Adjusted income (loss) from operations with average equity excluding goodwill | 9.3% |

88.     On February 17, 2022, Lincoln filed an annual report on Form 10-K with the SEC for its fiscal year 2021 (the "2021 10-K"), which was signed by Defendants Glass, Freitag, Connelly, Cunningham, Davis, Johnson, Kelly, Lachman, LeFebvre, Liang, Mee, Pittard, and

Utter. With respect to Lincoln's valuation of goodwill and other intangible assets, the 2021 10-K

stated:

> ***Goodwill and intangible assets with indefinite lives are not amortized, but are reviewed for impairment annually as of October 1 and more frequently if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value.*** Intangibles that do not have indefinite lives are amortized over their estimated useful lives. ***We perform a quantitative goodwill impairment test where the fair value of the reporting unit is determined and compared to the carrying value of the reporting unit. If the carrying value of the reporting unit exceeds the reporting unit's fair value, goodwill is impaired and written down to the reporting unit's fair value.*** The results of one test on one reporting unit cannot subsidize the results of another reporting unit. For the purposes of the evaluation of the carrying value of goodwill, our reporting units (Annuities, Retirement Plan Services, Life Insurance and Group Protection) correspond with our reporting segments.

* * *

> As of October 1, 2021 and 2020, ***we performed our annual quantitative goodwill impairment test for our reporting units, and, as of each such date, the fair value was in excess of each reporting unit's carrying value for Annuities, Retirement Plan Services, Life Insurance and Group Protection.***

89.     With respect to Lincoln's goodwill and specifically identifiable intangible assets,

the 2021 10-K reported:

| | Gross Goodwill as of Beginning-of-Year | Accumulated Impairment as of Beginning-of-Year | Acquisition Accounting Adjustments | Impairment | Net Goodwill as of End-of-Year |
|---|---|---|---|---|---|
| | **For the Year Ended December 31, 2021** | | | | |
| Annuities | $ 1,040 | $ (600) | $ - | $ - | $ 440 |
| Retirement Plan Services | 20 | - | - | - | 20 |
| Life Insurance | 2,188 | (1,554) | - | - | 634 |
| Group Protection | 684 | - | - | - | 684 |
| Total goodwill | $ 3,932 | $ (2,154) | $ - | $ - | $ 1,778 |

90.     The 2021 10-K stated that Lincoln's Life Insurance segment held $6,430 million in

DAC and VOBA gross, and $4,758 million in unrealized gain on the same, for a carrying value of

$1,672 million.

91.     The 2021 10-K repeated substantially similar statements with respect to Lincoln's policies regarding the review of deferred acquisition costs and the assumption of reserves that were contained in the 2020 10-K.

92.     On May 4, 2022, Lincoln issued a press release announcing the Company's financial results for the first fiscal quarter of 2022, which reported the following:

| (in millions, except per share data) | As of or For the Three Months Ended March 31, | |
|---|---|---|
|  | 2022 | 2021 |
| Net Income (Loss) | $    104 | $    225 |
| Net Income (Loss) Available to Common Stockholders | 103 | 225 |
| Net Income (Loss) per Diluted Share Available to Common Stockholders | 0.58 | 1.16 |
| Revenues | 4,687 | 4,534 |
| Adjusted Income (Loss) from Operations | 294 | 350 |
| Adjusted Income (Loss) from Operations per Diluted Share Available to Common Stockholders | 1.66 | 1.82 |
| Average Diluted Shares | 176.4 | 193.1 |
| Return on Equity (ROE), Including Accumulated Other Comprehensive Income (AOCI) (Net Income) | 2.4% | 4.3% |
| Adjusted Operating ROE, Excluding AOCI (Adjusted Income from Operations) | 8.6% | 10.2% |
| Book Value per Share (BVPS), Including AOCI | $    85.59 | $    102.50 |
| Book Value per Share, Excluding AOCI | 78.32 | 72.36 |

\* \* \*

Life Insurance sales of $155 million, up 36%, with **growth across all major product lines.**

\* \* \*

Life Insurance reported income from operations of $58 million compared to $107 million in the prior-year quarter as improved **pandemic-related mortality was more than offset by less favorable returns within the company's alternative investment portfolio and less favorable underlying mortality**.

\* \* \*

| Average Stockholders' Equity | | |
|---|---|---|
| Average equity, including average AOCI | $ | 17,492 |
| Average AOCI | | 3,846 |
| Average equity, excluding AOCI | | 13,646 |
| Average goodwill | | 1,778 |
| Average equity, excluding AOCI and goodwill | $ | 11,868 |
| | | |
| **Return on Equity, Including AOCI** | | |
| Net income (loss) with average equity including goodwill | | 2.4% |
| | | |
| **Adjusted Operating Return on Equity, Excluding AOCI** | | |
| Adjusted income (loss) from operations with average equity including goodwill | | 8.6% |
| Adjusted income (loss) from operations with average equity excluding goodwill | | 9.9% |

93.     On May 5, 2022, Lincoln filed a quarterly report on Form 10-Q with the SEC for its first fiscal quarter of 2022 (the "1Q22 10-Q), which reported the following results from the Company's Life Insurance segment, in millions:

| | For the Three Months Ended March 31, | |
|---|---|---|
| | 2022 | 2021 |
| **Operating Revenues** | | |
| Insurance premiums [1] | $ 277 | $ 253 |
| Fee income | 846 | 867 |
| Net investment income | 688 | 809 |
| Operating realized gain (loss) [2] | 1 | (2) |
| Amortization of deferred gain on business sold through reinsurance | 12 | 3 |
| Other revenues | 1 | 9 |
| Total operating revenues | 1,825 | 1,939 |
| **Operating Expenses** | | |
| Interest credited | 325 | 370 |
| Benefits | 1,126 | 1,173 |
| Commissions and other expenses | 309 | 266 |
| Total operating expenses | 1,760 | 1,809 |
| Income (loss) from operations before taxes | 65 | 130 |
| Federal income tax expense (benefit) | 7 | 23 |
| Income (loss) from operations | $ 58 | $ 107 |

[1] Includes term insurance premiums, which have a corresponding partial offset in benefits for changes in reserves.
[2] See "Realized Gain (Loss)" below.

94.     The 1Q22 10-Q repeated substantially similar statements with respect to the Company's policies regarding reserves and hedging that were contained in the 3Q20 10-Q.

95.     The 1Q22 10-Q repeated substantially similar statements regarding the Company's use of a "mortality rate [] based on a combination of company and industry experience, adjusted for improvement factors" that were contained in the 3Q20 10-Q, and reported the following:

**Liabilities**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Future contract benefits – | | | | | | | |
| indexed annuity contracts | | | | | | | |
| embedded derivatives | $ | (5,574) | Discounted cash flow | Lapse rate [3] | 0%  -  9% | (10) | |
| | | | | Mortality rate [7] | (9) | (10) | |
| Other liabilities – | | | | | | | |
| GLB ceded embedded | | | | | | | |
| derivatives | | (174) | Discounted cash flow | Long-term lapse rate [3] | 1%  -  30% | (10) | |
| | | | | Utilization of guaranteed withdrawals [4] | 85%  -  100% | (10) | 94% |
| | | | | Claims utilization factor [5] | 60%  -  100% | (10) | |
| | | | | Premiums utilization factor [5] | 80%  -  115% | (10) | |
| | | | | NPR [6] | 0.14%  -  1.59% | (10) | 1.14% |
| | | | | Mortality rate [7] | (9) | (10) | |
| | | | | Volatility [8] | 1%  -  28% | (10) | 14.53% |

[1]  Unobservable inputs were weighted by the relative fair value of the instruments, unless otherwise noted.

[2]  The liquidity/duration adjustment input represents an estimated market participant composite of adjustments attributable to liquidity premiums, expected durations, structures and credit quality that would be applied to the market observable information of an investment.

[3]  The lapse rate input represents the estimated probability of a contract surrendering during a year, and thereby forgoing any future benefits. The range for indexed annuity contracts represents the lapse rates during the surrender charge period.

[4]  The utilization of guaranteed withdrawals input represents the estimated percentage of contract holders that utilize the guaranteed withdrawal feature.

[5]  The utilization factors are applied to the present value of claims or premiums, as appropriate, in the GLB reserve calculation to estimate the impact of inefficient withdrawal behavior, including taking less than or more than the maximum guaranteed withdrawal.

[6]  The NPR input represents the estimated additional credit spread that market participants would apply to the market observable discount rate when pricing a contract.  The NPR input was weighted by the absolute value of the sensitivity of the reserve to the NPR assumption.

[7]  The mortality rate input represents the estimated probability of when an individual belonging to a particular group, categorized according to age or some other factor such as gender, will die.

[8]  The volatility input represents overall volatilities assumed for the underlying variable annuity funds, which include a mixture of equity and fixed-income assets.  Fair value of the variable annuity GLB embedded derivatives would increase if higher volatilities were used for valuation.  Volatility assumptions vary by fund due to the benchmarking of different indices.  The volatility input was weighted by the relative account value assigned to each index.

[9]  The mortality rate is based on a combination of company and industry experience, adjusted for improvement factors.

[10]  A weighted average input range is not a meaningful measurement for lapse rate, utilization factors or mortality rate.

96.    On August 3, 2022, Lincoln issued a press release announcing the Company's financial results for the second fiscal quarter of 2022, which reported the following:

| | As of or For the Three Months Ended June 30, | | As of or For the Six Months Ended June 30, | |
|---|---|---|---|---|
| (in millions, except per share data) | 2022 | 2021 | 2022 | 2021 |
| Net Income (Loss) | $   238 | $   642 | $   341 | $   867 |
| Net Income (Loss) Available to Common Stockholders | 231 | 642 | 334 | 867 |
| Net Income (Loss) per Diluted Share Available to Common Stockholders | 1.34 | 3.34 | 1.91 | 4.51 |
| Revenues | 5,104 | 4,851 | 9,791 | 9,386 |
| Adjusted Income (Loss) from Operations | 391 | 608 | 685 | 959 |
| Adjusted Income (Loss) from Operations per Diluted Share Available to | | | | |
| Common Stockholders | 2.23 | 3.17 | 3.88 | 4.98 |
| Average Diluted Shares | 172.7 | 192.2 | 174.6 | 192.4 |
| Return on Equity (ROE), Including Accumulated Other Comprehensive | | | | |
| Income (AOCI) (Net Income) | 8.0% | 12.4% | 4.6% | 8.3% |
| Adjusted Operating ROE, Excluding AOCI (Adjusted Income from Operations) | 11.6% | 17.3% | 10.1% | 13.8% |
| Book Value per Share (BVPS), Including AOCI | $   53.97 | $   115.00 | $   53.97 | $   115.00 |
| Book Value per Share, Excluding AOCI | 79.49 | 75.45 | 79.49 | 75.45 |

\* \* \*

Life Insurance sales of $193 million are up 53% with ***growth across all products***.

\* \* \*

Life Insurance reported income from operations of $114 million compared to $255 million in the prior-year quarter driven primarily by less favorable returns within the company's alternative investment portfolio.

\* \* \*

| | |
|---|---:|
| **Average Stockholders' Equity** | |
| Average equity, including average AOCI | $  11,950 |
| Average AOCI | (1,547) |
| Average equity, excluding AOCI | 13,497 |
| Average goodwill | 1,778 |
| Average equity, excluding AOCI and goodwill | $  11,719 |
| | |
| **Return on Equity, Including AOCI** | |
| Net income (loss) with average equity including goodwill | 8.0% |
| | |
| **Adjusted Operating Return on Equity, Excluding AOCI** | |
| Adjusted income (loss) from operations with average equity including goodwill | 11.6% |
| Adjusted income (loss) from operations with average equity excluding goodwill | 13.3% |

97.     On August 4, 2022, Lincoln filed a quarterly report on Form 10-Q with the SEC for its second fiscal quarter of 2022, which reported the following results from the Company's Life Insurance segment, in millions:

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| **Operating Revenues** | | | | |
| Insurance premiums [1] | $ 283 | $ 258 | $ 560 | $ 511 |
| Fee income | 840 | 915 | 1,686 | 1,783 |
| Net investment income | 665 | 852 | 1,353 | 1,661 |
| Operating realized gain (loss) [2] | (2) | (2) | (1) | (4) |
| Amortization of deferred gain on business sold through reinsurance | 12 | 3 | 25 | 5 |
| Other revenues | 2 | 3 | 2 | 12 |
| Total operating revenues | 1,800 | 2,029 | 3,625 | 3,968 |
| **Operating Expenses** | | | | |
| Interest credited | 329 | 372 | 653 | 742 |
| Benefits | 1,041 | 999 | 2,167 | 2,172 |
| Commissions and other expenses | 291 | 341 | 601 | 607 |
| Total operating expenses | 1,661 | 1,712 | 3,421 | 3,521 |
| Income (loss) from operations before taxes | 139 | 317 | 204 | 447 |
| Federal income tax expense (benefit) | 25 | 62 | 32 | 85 |
| Income (loss) from operations | $ 114 | $ 255 | $ 172 | $ 362 |

[1]   Includes term insurance premiums, which have a corresponding partial offset in benefits for changes in reserves.
[2]   See "Realized Gain (Loss)" below.

98.     The 2Q22 10-Q repeated substantially similar statements with respect to the Company's policies regarding reserves and hedging that were contained in the 3Q20 10-Q.

99.     The 2Q22 10-Q repeated substantially similar statements regarding the Company's use of a "mortality rate [] based on a combination of company and industry experience, adjusted for improvement factors" that were contained in the 3Q20 10-Q, and reported the following:

| Liabilities | | | | | |
|---|---|---|---|---|---|
| Future contract benefits – indexed annuity contracts embedded derivatives | $ (3,476) | Discounted cash flow | Lapse rate (3) | 0% - 9% | (10) |
| | | | Mortality rate (7) | (9) | (10) |
| Other liabilities – GLB ceded embedded derivatives | (136) | Discounted cash flow | Long-term lapse rate (3) | 1% - 30% | (10) |
| | | | Utilization of guaranteed withdrawals (4) | 85% - 100% | 94% |
| | | | Claims utilization factor (5) | 60% - 100% | (10) |
| | | | Premiums utilization factor (5) | 80% - 115% | (10) |
| | | | NPR (6) | 0.25% - 2.11% | 1.53% |
| | | | Mortality rate (7) | (9) | (10) |
| | | | Volatility (8) | 1% - 28% | 14.08% |

(1)  Unobservable inputs were weighted by the relative fair value of the instruments, unless otherwise noted.
(2)  The liquidity/duration adjustment input represents an estimated market participant composite of adjustments attributable to liquidity premiums, expected durations, structures and credit quality that would be applied to the market observable information of an investment.
(3)  The lapse rate input represents the estimated probability of a contract surrendering during a year, and thereby forgoing any future benefits. The range for indexed annuity contracts represents the lapse rates during the surrender charge period.
(4)  The utilization of guaranteed withdrawals input represents the estimated percentage of contract holders that utilize the guaranteed withdrawal feature.
(5)  The utilization factors are applied to the present value of claims or premiums, as appropriate, in the GLB reserve calculation to estimate the impact of inefficient withdrawal behavior, including taking less than or more than the maximum guaranteed withdrawal.
(6)  The NPR input represents the estimated additional credit spread that market participants would apply to the market observable discount rate when pricing a contract. The NPR input was weighted by the absolute value of the sensitivity of the reserve to the NPR assumption.
(7)  The mortality rate input represents the estimated probability of when an individual belonging to a particular group, categorized according to age or some other factor such as gender, will die.
(8)  The volatility input represents overall volatilities assumed for the underlying variable annuity funds, which include a mixture of equity and fixed-income assets. Fair value of the variable annuity GLB embedded derivatives would increase if higher volatilities were used for valuation. Volatility assumptions vary by fund due to the benchmarking of different indices. The volatility input was weighted by the relative account value assigned to each index.
(9)  The mortality rate is based on a combination of company and industry experience, adjusted for improvement factors.
(10)  A weighted average input range is not a meaningful measurement for lapse rate, utilization factors or mortality rate.

100.    The above statements identified in ¶¶61-99 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Lincoln's variable universal life insurance business was declining; (ii) as a result, the Company's goodwill related to its Life Insurance segment was materially overstated; (iii) Lincoln was therefore relying on outdated policy lapse assumptions; (iv) Lincoln's reserves were therefore overstated; and (v) as a result of the foregoing, the Individual Defendants' positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth Emerges***

101.    On November 2, 2022, the Company announced its financial results for the third fiscal quarter of 2022, disclosing a net loss of $2.6 billion, compared to a net income of $318 million during the same period of the prior year. The Company stated that "[t]he current quarter's

adjusted operating results included net unfavorable notable items of $2.0 billion, or $11.62 per share, related to the company's annual review of DAC and reserve assumptions." The Company further revealed that it "incurred a $634 million goodwill impairment to the life insurance business." The Company further stated:

> Lincoln Financial Group (NYSE: LNC) today reported a net loss for the third quarter of 2022 of $(2.6) billion, or $(15.17) per diluted share available to common stockholders, compared to net income in the third quarter of 2021 of $318 million, or $1.68 per diluted share available to common stockholders. Third quarter adjusted loss from operations was $(1.7) billion, or $(10.23) per diluted share available to common stockholders, compared to adjusted income from operations of $307 million, or $1.62 per diluted share available to common stockholders, in the third quarter of 2021.

> The current quarter's adjusted operating results included net unfavorable notable items of $2.0 billion, or $11.62 per share, related to the company's annual review of DAC and reserve assumptions. This charge corresponds to an estimated $550 million statutory capital impact equating to a 22-point decline in the risk-based capital ratio. The review charge and the statutory impact both relate primarily to updated guaranteed universal life insurance lapse assumptions in response to emerging experience, combined with recently validated external industry perspectives. Separately, Lincoln incurred a $634 million goodwill impairment to the life insurance business. Additional information on the company's annual review of DAC and reserve assumptions is available in a supplemental presentation on the company's website at http://www.lincolnfinancial.com/investor.

> The prior-year quarter included net unfavorable notable items of $108 million, or $0.57 per share, primarily related to legal expenses and the company's annual review of DAC and reserve assumptions.

> "The significant charge we recorded during the third quarter and the statutory capital impact to be booked at the end of 2022 resulted from our annual assumption review primarily due to policyholder lapsation behavior in our guaranteed universal life insurance block and will contribute to a decline in our RBC ratio," said Ellen Cooper, president and CEO of Lincoln Financial Group. "We are confident we have ample capital to effectively operate the business as we replenish statutory capital back to our targeted level."

> Cooper concluded, "With a new leadership team in place, we are focused on clear actions to improve distributable earnings, reduce capital volatility and further diversify our business mix. We continue to see solid performance across all businesses with our product strategies, resulting in strong sales growth at or above targeted returns, positive net flows in our Annuity and Retirement businesses, and

continued progress on our Group margin improvement."

\* \* \*

**Review of Life Insurance Goodwill**
The company's review of the goodwill asset pertaining to Life Insurance resulted
in a non-cash charge of $634 million, or $3.73 per share, to net income.

The goodwill impairment is primarily due to variable universal life insurance equity
market impacts and the use of a higher discount rate.

102.    On this news, the price of Lincoln's stock declined 33.2% in one day, closing at a

price of $34.83 per share on November 3, 2022.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

103.    Plaintiff brings this action derivatively in the right and for the benefit of the

Company to redress injuries suffered and to be suffered as a direct and proximate result of the

Individual Defendants' breaches of fiduciary duties and other violations of law.

104.    Lincoln is named solely as a nominal party in this action.  This is not a collusive

action to confer jurisdiction on this Court that it would otherwise not have.

105.    Plaintiff will adequately and fairly represent the interests of the Company in

enforcing and prosecuting its rights and retained counsel competent and experienced in derivative

litigation.

106.    Plaintiff is an owner of Lincoln stock and has been a continuous holder of the

Company's common shares at all relevant times.

107.    At the time this action was commenced, the twelve-member Board was comprised

of Defendants Cooper, Connelly, Cunningham, Davis, Johnson, Kelly, Lachman, LeFebvre,

Liang, Mee, Ryan, and Utter, along with Owen M. Ryan, who joined the Board in 2023.

Accordingly, Plaintiff is only required to show that six directors cannot exercise independent

objective judgment about whether to bring this action or whether to vigorously prosecute this

action. As set forth below all, and if not all then at least eleven, of the Board's current directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

108.    The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Individual Defendants could not fairly and fully prosecute such a suit even if they instituted it.

109.    The Individual Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

110.    As members of the Board charged with overseeing the Company's affairs, each of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Lincoln, the Individual Defendants knew, or should have known, the material facts surrounding the success and performance of the Company's

Life Insurance business segment.

111.    Defendant Cooper is not disinterested or independent, and therefore, is incapable of considering a demand because she is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

112.    Defendants Connelly, Davis, Kelly, Lachman, and LeFebvre serve as members of the Audit Committee and, pursuant to the Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding material deficiencies in the Company's accounting practices and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Connelly, Davis, Kelly, Lachman, and LeFebvre cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

113.    Additionally, each of the directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Individual Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Individual Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Lincoln stock and stock options they held.

114.    The Individual Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties

required by applicable laws, rules, and regulations, requiring the Individual Defendants to also adhere to Lincoln's standards of business conduct. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

115.    Furthermore, demand in this case is excused because each of the directors derive substantial revenue from the Company, control the company, and are indebted to each other. These conflicts of interest have precluded the current directors from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct. Significantly, none of the Individual Defendants have taken remedial action to redress the conduct alleged herein.

116.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

117.    The acts complained of herein constitute violations of fiduciary duties owed by Lincoln's officers and directors, and these acts are incapable of ratification.

118.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Lincoln. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Lincoln, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

119.    If there is no directors' and officers' liability insurance, then the Individual Defendants will not cause Lincoln to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

120.    Accordingly, for all of the reasons set forth above, all of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT I

### Against the Individual Defendants for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)

121.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

122.  The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

123.  The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2021 Proxy filed with the SEC. As alleged above, this filing contained materially false and misleading statements concerning the Company's goodwill and its internal controls over financial reporting.

124.  The 2021 Proxy was used to solicit shareholder votes in connection with the election of Defendants Connelly, Cunningham, Davis, Glass, Henderson, Johnson, Kelly, Lachman, Mee, Pittard, and Utter to serve for another one-year term on the Company's Board. In addition, the 2021 Proxy was also used to solicit the advisory vote to approve the compensation of, *inter alia*, Defendants Glass, Freitag, and Cooper. While the shareholder vote was non-binding, the 2021 Proxy indicated that "the Board and the Compensation Committee will consider the voting results when determining compensation policies and decisions, including future executive compensation decisions. Notwithstanding the advisory nature of the vote, the [proposed executive compensation plan] will be approved if more votes are cast for the proposal than against it."

125.  The 2021 Proxy indicates that compensation is performance-based, stating that "the key objectives of [the Company's] pay for performance philosophy are to . . . allow the compensation of [the Company's] executives to vary meaningfully with performance and reward the achievement of superior financial results and shareholder returns."

126.  The materially false and misleading statements contained in the 2021 Proxy regarding the Company's goodwill and its internal controls over financial reporting therefore misleadingly induced shareholders to vote in favor of the election of Defendants Connelly,

Cunningham, Davis, Glass, Henderson, Johnson, Kelly, Lachman, Mee, Pittard, and Utter and performance-based compensation to Defendants Glass, Freitag, and Cooper, to which they were not entitled.

127.    The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

## COUNT II

### Against the Individual Defendants for
### Breach of Fiduciary Duties

128.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

130.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

131.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

132.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

133.     Plaintiff, on behalf of Lincoln, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

134.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

135.     By encouraging and accomplishing the illegal and improper actions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

136.     Plaintiff, on behalf of Lincoln, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

137.     Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

138.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Lincoln.

139.    The Individual Defendants were unjustly enriched by their receipt of bonuses, stock options, or similar compensation from Lincoln that was tied to their performance or to the artificially inflated valuation of Lincoln.

140.    Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

141.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

142.    Plaintiff, on behalf of Lincoln, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants
### for Waste of Corporate Assets

143.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

144.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Lincoln's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

145.    As a result of the misconduct described above, the Individual Defendants wasted

corporate assets by, among other things, incurring and paying defense costs in connection with the Securities Class Action, and approving performance-based compensation linked to the Company's perceived successes.

146.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

147.     Plaintiff on behalf Lincoln has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.     Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.     Awarding punitive damages;

D.     Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Date: June 20, 2024

**GRABAR LAW OFFICE**

*Joshua H. Grabar*

Joshua H. Grabar (PA Bar #82525)
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone:  267-507-6085
Facsimile: 267-507-6048
Email: jgrabar@grabarlaw.com


**RIGRODSKY LAW, P.A.**

Timothy J. MacFall
Samir Aougab
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683.3516
Facsimile: (302) 654-7530
Email: tjm@rl-legal.com
Email: sa@rl-legal.com


*Counsel for Plaintiff*